# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.   1:22-mj-96 |
| O'Rourke Wrecking Company/Whitewater Reclamation Company premises located at 4250 Hooven Road, Cleves, Ohio 45002 | ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy to commit offense or to defraud US |
| 42 U.S.C. § 7431(c)(2)(C) | Tampering with a Monitoring Device and Method |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Michael Jt Schmitt*
_____
*Applicant's signature*

Michael Schmitt, Special Agent, EPA
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Facetime.

Date:  **Feb 16, 2022**

*Karen L. Litkovitz*
Karen L. Litkovitz
**United States Magistrate Judge**

City and state:  Cincinnati, Ohio

00862

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| IN THE MATTER OF THE SEARCH OF | Case No.    1:22-mj-96 |
|---|---|
| O'Rourke Wrecking Company/Whitewater Reclamation Company premises located at 4250 Hooven Road, Cleves, Ohio 45002 | **Filed Under Seal** |

## **AFFIDAVIT**

I, Michael Schmitt, being duly sworn, state as follows:

1.     I am a Special Agent with the Environmental Protection Agency Criminal Investigation Division (EPA-CID), Cleveland Resident Office in Middleburg Heights, Ohio. I have been employed with EPA-CID since July 2019. I have completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Brunswick, Georgia. Prior to my employment with EPA-CID, I was a federal law enforcement officer with the Naval Criminal Investigative Service (NCIS) for four years. Prior to NCIS, I served as a Military Police Commissioned Officer in the United States Army for four years.

2.     As part of my duties as an EPA-CID Special Agent, I investigate criminal violations of environmental laws, including Title 42, United States Code, Section 7401 *et seq.* ("the Clean Air Act or "CAA"), as well as violations of Title 18 of the United States Code. I have been the affiant of and participated in the execution of multiple federal search warrants.

3.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search of O'Rourke Wrecking Company/Whitewater Reclamation Company premises located at 4250 Hooven Road, Cleves, Ohio 45002 as further described in **Attachment A** (the "SUBJECT PREMISES"), and the seizure of certain information and material as further described in **Attachment B**.

4.     The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause to believe that evidence and instrumentalities of violations of Title 42, United States Code, Section 7413(c)(2)(C), are located at the SUBJECT PREMISES. Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part.

## I.     BACKGROUND INFORMATION

5.     The purpose of the Clean Air Act is, among other things, "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). In

enacting the CAA, Congress found that "the increasing use of motor vehicles . . . has resulted in mounting dangers to the public health and welfare." 42 U.S.C. § 7401(a)(2).

6. The CAA regulates "mobile sources," which include motor vehicles and engines and nonroad vehicles and engines. Mobile sources must comply with the CAA emission standards. Those standards apply to mobile sources such as cars, trucks, buses, recreational vehicles and engines, generators, farm and construction machines, lawn and garden equipment, marine engines, and locomotives. The CAA emission standards are based on the type of air pollutant, its source, and even the region of the country in which it is emitted.

7. Pursuant to 42 U.S.C. §§ 7521-7554, the EPA has promulgated regulations that establish standards limiting the emission of air pollutants from various classes of motor vehicle engines. These regulations limit vehicle emissions of various types of pollutants including non-methane hydrocarbons (NMHC), nitrogen oxides (NOx), particulate matter (PM), and carbon monoxide (CO). Heavy-duty vehicles and heavy-duty diesel engines (HDDEs) are one class, and are subject to the regulations found at 40 C.F.R. Part 86, Subpart A. Light-duty vehicles and trucks and medium-duty passenger vehicles are subject to the regulations found at 40 C.F.R. Part 86, Subpart S. The CAA requires that the emission standards must generally "reflect the greatest degree of emission reduction achievable through the application of [available] technology." 42 U.S.C. § 7521(a)(3)(A)(i). Accordingly, the EPA has

established emission standards for vehicles and engines. 40 C.F.R. §§ 86.004-11, 86.007-11, 86.099-11 (HDDE); 40 C.F.R. §§ 86.1811-04, 86.1811-09, 86.1811-10, 86.1811-17 (light-duty/medium-duty vehicles).

8. To meet relevant emissions standards, motor vehicle and engine manufacturers employ a variety of "elements of design" or emissions control devices which are "any control system (i.e., computer software, electronic control system, emission control system, computer logic), and/or control system calibrations, and/or the results of system interaction, and/or hardware items on a motor vehicle or motor vehicle engines." 40 C.F.R. §§ 86.094-2 and 86.1803-01.

9. For diesel-fueled motor vehicles, these elements of design or emissions control devices may include hardware devices such as a diesel-particulate filter (DPF), exhaust gas recirculation (EGR), diesel oxidation catalyst (DOC), and selective catalytic reduction (SCR) system. The SCR is a type of catalytic converter that uses diesel exhaust fluid (DEF), which is a urea-based fluid sprayed into the exhaust stream as a part of reducing NOx emissions. DEF used with an SCR system is also known as a liquid reducing agent or "reductant." *See* 40 C.F.R. §§ 86.004-2, 86.1803-01, & 1039.110. Vehicle manufacturers choose various strategies involving these systems (sometimes collectively referred to as aftertreatment) to meet the regulatory standards.

10. The EPA further exercised its authority under 42 U.S.C. § 7521(m)(1) and promulgated regulations requiring manufacturers to install on-board diagnostic

(OBD) systems on motor vehicles and engines. OBD systems must be "capable of monitoring all emission-related" engine systems or components, including the EGR, DOC, DPF, and SCR discussed above. 40 C.F.R. §§ 86.010-18 and 86.1806-05.

11.     The OBD system operates within a vehicle's "electronic control module" (ECM) which is essentially an on-board computer that receives inputs from various sensors and sends outputs through activators to control engine, vehicle, or equipment functions, including emission control components. The OBD is composed of software and sensors that monitor emissions-related engine systems and components. If an emissions-related malfunction or problem occurs, the OBD system causes a malfunction indicator light to be illuminated on the vehicle's dashboard and a diagnostic trouble code to be stored in the OBD's memory. These functions facilitate the detection and diagnosis of a malfunction in the emissions control system. If the malfunction is serious and is not resolved, the OBD system may limit the top speed of some vehicles to as low as five miles per hour (an effect commonly referred to as "limp mode" or "power reduced mode"), providing an incentive for the vehicle's operator to seek repairs.[1]

12.     The EPA has also promulgated regulations that establish standards limiting the emission of air pollutants from nonroad diesel engines that power

---

[1] Standardized OBD requirements (the current generation is referred to as OBD II) for light-duty/medium-duty vehicles have been phased in since 1996 and as of model year 2008, all motor vehicles in this weight class are required to be equipped with up-to-date OBD II. Standardized OBD requirements for heavy-duty vehicles equipped with HDDE (referred to as HD OBD) have been phased in since 2010 and, as of model year 2013, all engines installed in models in this weight class are required to be equipped with up-to-date HD OBD.

nonroad vehicles. *See* 40 C.F.R. Part 1039. A nonroad engine is an internal combustion engine that is not used in a motor vehicle designed for transporting persons or property on highways or in a vehicle used solely for competition. 42 U.S.C. § 7550(10). The EPA's regulations recognize that nonroad engines are used on dual purpose equipment that both propels itself and performs another function, such as construction equipment. 40 C.F.R. § 1068.30. As with diesel-fueled motor vehicles, nonroad engine and vehicle manufacturers may equip the nonroad engine with the emissions control devices discussed above (DPF, EGR, DOC, and SCR using DEF) to meet EPA's established emissions standards. Nonroad engines equipped with SCR systems that use a DEF must have a diagnostic system that monitors fluid quality and tank levels and alerts users when the tank is empty and maintenance is required on the SCR and DEF system. 40 C.F.R. § 1039.110(a). The manufacturer may use a warning light or audible alarm as the alert. *Id.*[2]

13.     There is some public perception that vehicles equipped with more advanced emissions control systems have lower vehicle power, fuel economy, reliability, and cost more to maintain. As a result, some vehicle owners disable the emissions control devices and override the OBD through use of aftermarket defeat devices in an effort to: increase power and fuel economy; minimize maintenance downtime related to emissions control devices; and minimize operating and

---

[2] The diagnostic monitoring requirements for nonroad engines apply to all model year 2018 and later nonroad engines that use a SCR system with DEF.

maintenance costs associated with emissions control devices. However, these changes come at the expense of significantly higher emissions. A "defeat device" is software or hardware that "reduces the effectiveness of the emissions control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use." 40 C.F.R. §§ 86.094-2 and 86.1803-01.

14. The illegal tampering with and/or manipulation of emissions control systems is commonly known in the industry as "deletion," and companies that offer tampering devices typically refer to them as "delete kits." Sometimes "kit" is used as shorthand to refer to "delete kits." Deletion often involves two aspects: the physical alteration of engine-related emissions control device hardware; and the alteration of the engine computer's software. Individuals engaged in deletion may physically remove the emission control hardware or otherwise manipulate the hardware to render it inoperative.

15. The next aspect of emissions deletions typically includes engine computer software alterations or tampering (often referred to as "programming," "reprogramming," or "tuning") to avoid problems (i.e. diagnostic trouble codes, malfunction indicator lights, and derating), discussed above which can occur when the OBD detects malfunctioning emissions control devices that have been removed or manipulated. For instance, programming can prevent a diagnostic trouble code from being recorded in the vehicle's computer and the malfunction indicator light from being illuminated on the dashboard after the associated emissions control component

tampering. The programming conceals the emissions control malfunction. Individuals engaged in deletion may tamper with the OBD/ECM by using "tuners," which are devices that carry electronic files or software coding ("tunes") designed to alter vehicle performance by changing and overriding the vehicle's original computer programming. Individuals engaged in deletion also may alter or tamper with the engine computer software by connecting the engine computer to a laptop to allow a third party to access remotely the engine's computer and reprogram its software.

16.     The CAA prohibits a person from removing or rendering inoperative a device installed on a motor vehicle as required by mobile source regulations before sale, before delivery of the motor vehicle to the ultimate purchaser, or after sale. 42 U.S.C. § 7522(a)(3)(A). It also prohibits persons from manufacturing, selling, or installing any part which has the "principal effect" of bypassing, defeating, or making inaccurate any device required by regulations when the person knows or should know the part serves such a purpose. 42 U.S.C. § 7522(a)(3)(B). Violations of these statutory provisions can trigger civil, but not criminal, enforcement.

17.     In addition to these civil enforcement mechanisms, the CAA provides criminal penalties for tampering with emissions monitoring devices. In particular, 42 U.S.C. § 7413(c)(2)(C) provides that any person who knowingly falsifies, tampers with, renders inaccurate, or fails to install any emissions monitoring device or method required to be maintained or followed under the CAA shall, upon conviction, be subject to a fine and up to two years of imprisonment.

18. OBD systems, as well as the diagnostic systems for reductant use on nonroad vehicles, are monitoring devices or methods required to be maintained or followed under the CAA to ensure that both the emissions-monitoring computer software and the hardware emission control devices of motor vehicles are functioning properly. *See* 40 C.F.R. §§ 86.010-18(a) (requiring OBD system for HDDE's "capable of monitoring all emission-related engine systems or components during the life of the engine"), 86.1806-05(a)(1) (requiring OBD systems for subject vehicles "capable of monitoring all emission-related powertrain systems or components during the applicable useful life of the vehicle"), and 1039.110(a) (requiring nonroad engines equipped with SCR systems using DEF "have a diagnostic system that monitors reductant quality and tank levels"). Therefore, knowingly tampering with an OBD system or diagnostic system on a nonroad vehicle or engine, with a model year of 2018 or later, is a criminal violation of the CAA.

## II.  FACTS SUPPORTING PROBABLE CAUSE TO SEARCH THE SUBJECT PREMISES

19. Law enforcement is currently investigating allegations of emissions tampering and other violations of federal law as part of a joint multi-agency investigation. During the course of this investigation, law enforcement has interviewed witnesses and conducted other investigative steps.

20. O'Rourke Wrecking Company is a demolition and hazardous material abatement services company based in Hamilton County, Ohio. Michael O'Rourke is

the President and his wife Michele O'Rourke serves as the Chief Executive Officer and majority owner of O'Rourke Wrecking Company. Michael and Michele O'Rourke are husband and wife. According to the O'Rourke Wrecking Company website, the company operates "nationwide," and "owns a 55 acre State permitted Construction and Demolition Landfill and Recycling Facility located in Hooven, OH." The website identifies this facility as Whitewater Reclamation & Recycling Facility.

21.    Based on my personal knowledge of this investigation, I know O'Rourke Wrecking Company operates under several business names including O'Rourke Construction Company, O'Rourke Equipment Services Company, O'Rourke Heavy Highway, O'Rourke Wrecking Service Company, O'Rourke Wrecking Group, O'Rourke Wrecking Transport Company, and M&M Services Group Inc.

22.    On or about September 7, 2021, EPA-CID's Cleveland Resident Office received information through the EPA Tip System regarding O'Rourke Wrecking Company. The tip alleged O'Rourke Wrecking Company had deleted the emissions control systems on approximately thirty vehicles and/or pieces of equipment. The tip provided an address for the primary incident location as 4250 Hooven Road, Cleves, OH 45002. Based on a review of public source mapping information, this site is adjacent to a residential community made up of what appear to be detached single family homes. The tip was submitted by and contained contact information for **Individual A**.

10

23. On or about September 17, 2021, I had telephonic contact with **Individual A**. **Individual A** stated they were a former employee of O'Rourke Wrecking Company and had firsthand knowledge of the company deleting emissions control systems on diesel motor vehicles, heavy duty motor vehicles powered by heavy duty diesel engines, and heavy equipment powered by nonroad diesel engines. **Individual A** was willing to provide further information and agreed to an in-person interview.

24. On October 13, 2021, an EPA-CID Task Force Officer and I conducted an in-person interview of **Individual A**. **Individual A** stated he/she worked for O'Rourke Wrecking Company as a mechanic from 2017 until on or about September 3, 2021. As a mechanic, **Individual A** stated he/she is very familiar with diesel engines, including emissions control systems/components. **Individual A** stated O'Rourke Wrecking Company owns a landfill, which he/she identified as Whitewater Reclamation Company. **Individual A** provided an address of 4250 Hooven Rd, Cleves, OH 45002. **Individual A** advised the mechanic shop for O'Rourke Wrecking Company is located at the Whitewater Reclamation Company facility. **Individual A** advised all the vehicles used by the company at job locations and at the landfill are marked with some form of the name "O'Rourke."

25. **Individual A** stated soon after he/she began working for O'Rourke Wrecking Company he/she noticed emissions control systems were being deleted. **Individual A** stated the primary mechanic completing the emissions deletions was

11

Nicholas BRUNS. **Individual A** identified Michael LINNEMAN as the service manager who authorized BRUNS to delete the emissions control systems. **Individual A** stated BRUNS completed some of the emissions deletions at his personal shop located in Indiana while LINNEMAN was the service manager. **Individual A** stated circa late 2020 or early 2021, LINNEMAN took another position with the company and BRUNS became the service manager. **Individual A** stated once BRUNS became the service manager all the emissions deletions were completed at the mechanic shop located at the Whitewater Reclamation landfill. **Individual A** stated the vehicles were deleted either due to the emissions control devices breaking or the belief that it would make the vehicles run better and last longer.

26.     **Individual A** stated O'Rourke Wrecking Company has approximately 20-25 diesel pickup trucks with deleted emissions control systems. **Individual A** identified these vehicles as Ford F250's through F550's, model years 2008 and up, with most being model year 2012 or newer. **Individual A** advised most of the above vehicles are assigned to foremen, however, three of the vehicles are used and remain at the landfill.

27.     **Individual A** stated the emissions deletions conducted by BRUNS and others at the SUBJECT PREMISES includes, but are not limited to, removing/drilling out the DPF, blocking off the EGR system, bypassing and/or removing the DEF system, and tuning the ECM. **Individual A** stated in order to prevent problems with removing the above components, these types of vehicles have

the ECM tuned with a small tuner/programmer but was unsure of the specific brand. **Individual A** stated some of the above vehicles still have the tuner located in the vehicle. **Individual A** stated BRUNS performs the majority of this work but two other mechanics, Braden HAMMOND and Richard INMAN, occasionally assist. **Individual A** stated he/she has personally witnessed these types of vehicles having the emissions control systems deleted. Based on my training and experience, I know the methods described above are consistent with manipulation of and tampering with the emissions control systems of diesel engines.

28. **Individual A** advised at least some of the parts used to delete the emissions control systems are purchased from Cincy Diesel, located at 10918 US-50, North Bend, OH 45052. **Individual A** stated O'Rourke employees are required to turn in invoices/receipts for purchases and either pay with a company credit card or seek reimbursement if they used personal funds. While **Individual A** advised he/she has not purchased parts to use to delete emissions control systems, he/she purchased other parts and was required to turn in the receipts/invoices.

29. **Individual A** stated O'Rourke Wrecking Company assigns their vehicles numbers, which are listed in areas on the vehicles including the fender and rear area. **Individual A** recalled and identified some of the vehicle numbers for O'Rourke Wrecking Company-owned diesel pickup trucks with deleted emissions control systems: # 033, # 221, # 222, # 226, # 227, # 230, # 231, # 232, # 234, # 238, #

13

239, and # 248. **Individual A** added that a Ford F550 (# 220) and a Kenworth (# 243) owned by O'Rourke Wrecking Company also had deleted emissions control systems.

30. **Individual A** advised O'Rourke Wrecking Company has deleted the emission control systems on at least three heavy duty diesel vehicles, which he/she described as dump trunks. According to **Individual A**, this included but is not limited to bypassing and/or removing the DEF, removing and/or driving a pipe through the DPF, and tuning the ECM. **Individual A** advised the tuning for these types of vehicles is outsourced by BRUNS. **Individual A** explained BRUNS will connect his work issued laptop computer to the vehicle and open a remote session. An unknown individual then remotely tunes the ECM so the vehicle will continue to work with the emissions control devices removed. **Individual A** believed the individual performing the remote ECM tuning was paid via credit card or PayPal. **Individual A** was able to provide some of the vehicle numbers for heavy duty diesel trucks with deleted emissions control systems: # 224, # 225, and # 229. **Individual A** stated vehicle # 223 had the emission control systems deleted but was sold at auction. **Individual A** stated he/she has personally witnessed these types of vehicles having the emissions control systems deleted. Based on my training and experience, I know the methods described above are consistent with manipulation of and tampering with emissions control systems of diesel engines.

31. **Individual A** advised O'Rourke Wrecking Company has deleted the emission control systems on at least 4-5 excavators, which utilize nonroad diesel

engines. **Individual A** stated this includes but is not limited to hollowing out the DPF and then welding it back together, blocking off the EGR system, and tuning the engine computer. **Individual A** stated the EGR lines are left in place, but a slug is welded in to block them off. **Individual A** advised the tuning for this type of equipment is outsourced by BRUNS. **Individual A** explained BRUNS will connect his work issued laptop computer to the excavator and open a remote session. An unknown individual then remotely tunes the ECM so the excavator will continue to work with the emissions control devices removed or disabled. **Individual A** believed the individual performing the remote ECM tuning was paid via credit card or PayPal. **Individual A** identified a CAT excavator # 188 as having the emissions control devices deleted but did not know the identification numbers of the other excavators with deleted emissions control systems. **Individual A** stated he/she has personally witnessed these types of vehicles having the emissions control systems deleted. **Individual A** also admitted in and around March or April 2021, he/she hollowed out the DPF on an excavator. **Individual A** advised BRUNS had cut the DPF open and instructed him/her to hollow it out. After the DPF was hollowed out by **Individual A**, BRUNS welded it back together. Based on my training and experience, I know the methods described above are consistent with manipulation of and tampering with emissions control systems of diesel engines.

32. **Individual A** advised on or about September 18, 2021, he/she was speaking with a current O'Rourke mechanic, **Individual E**. According to **Individual**

**A**, **Individual E** advised him/her that excavator # 712 was currently in the mechanic shop having the emissions control system deleted. **Individual A** stated **Individual E** did not disclose who was deleting the emissions control system on the excavator but based on his past experience he/she believed it would have to be BRUNS.

33.     **Individual A** explained that mechanics at O'Rourke Wrecking Company generate service reports whenever they work on company-owned vehicles and equipment. According to **Individual A,** these reports are paper copy and, in the past, would be physically saved. **Individual A** explained the paper copies are now scanned and electronically stored in the office trailer at the landfill, which also serves as the scale house. **Individual A** identified Jake VAN CUREN as the individual who scans the reports.

34.     **Individual A** advised BRUNS is issued a company laptop and that he/she has witnessed BRUNS take the laptop home at times. **Individual A** stated BRUNS is issued a company cell phone and provided the number as 513-200-3781. **Individual A** reported this is the number mechanics used to communicate with BRUNS.

35.     On January 25, 2022, an EPA-CID Task Force Officer and I conducted a follow up interview with **Individual A** by telephone. **Individual A** further explained that some of O'Rourke Wrecking Company's excavators used diesel exhaust fluid (DEF) systems and had been tampered with to turn the DEF systems off. **Individual A** stated that if an excavator ran out of DEF it would eventually enter a

16

"limp mode" if the DEF was not refilled. **Individual A** stated to prevent this from occurring, BRUNS had the excavator remotely tuned and therefore it would continue to operate without DEF. **Individual A** explained again that BRUNS would also delete the excavators by blocking off the EGR and hollowing out the DPF. In addition to the excavators he/she identified previously, **Individual A** identified O'Rourke Wrecking Company CAT model # 320 excavator and model # 336 excavator as having their emissions control systems deleted. **Individual A** also believed that O'Rourke Wrecking Company performed emissions control systems deletions on a Komatsu model excavator.

36. On October 27, 2021, an EPA-CID Task Force Officer and I conducted an in-person interview of **Individual B**. **Individual B** advised he/she was employed by Whitewater Reclamation Company landfill for approximately eight years until May 2021. **Individual B** advised the landfill is owned by O'Rourke Wrecking Company and essentially operates as one company. **Individual B** advised he/she was employed as a heavy equipment and vehicle mechanic and performed various tasks at the landfill. **Individual B** stated the mechanic shop for O'Rourke Wrecking Company is located at the landfill. As stated previously, the landfill and mechanic shop are located at 4250 Hooven Rd, Cleves, OH 45002. **Individual B** stated he/she was aware O'Rourke Wrecking Company deleted emissions control systems from their vehicles, to include tuning the vehicles' ECMs.

37.    **Individual B** stated at least three heavy duty diesel vehicles, which he/she described as dump trucks, had deleted emissions control systems. **Individual B** stated this included but was not limited to removing the DPF or rendering it inoperable and tuning the ECM. **Individual B** advised BRUNS would connect his laptop to the vehicle ECM and an unknown individual would remotely tune the ECM. **Individual B** recalled vehicles # 223, # 224, and # 225 had their emissions control systems deleted. **Individual B** stated the deletion of emissions control systems was completed when an emissions control device on a vehicle had a maintenance issue, which would cause the vehicle to go into limp mode. **Individual B** stated he/she last witnessed deletion of emissions control systems, which would include tuning the ECM, on this type of vehicle approximately one and a half years ago, but opined O'Rourke would still be utilizing the vehicles.

38.    **Individual B** stated O'Rourke Wrecking Company has at least ten diesel pickup trucks that have had the emissions control systems deleted. **Individual B** identified these vehicles as Ford F250's through F450's. **Individual B** stated this included but was not limited to blocking off the EGR system and tuning the ECM. **Individual B** stated BRUNS would hook a computer or programmer to the ECM and used an unknown system/program to complete the tuning. **Individual B** stated he/she has personally observed EGR blocking parts in the mechanic shop. **Individual B** stated he/she last witnessed deletion of emissions control systems on this type of vehicle approximately one year ago. **Individual B** stated O'Rourke Wrecking

18

Company rarely got rid of vehicles and would still be utilizing the vehicles that had been deleted. **Individual B** advised several of these types of vehicles are utilized by and remain at the landfill. **Individual B** stated the vehicles are marked with some form of "O'Rourke."

39. **Individual B** stated it is common knowledge by employees that deletion of emissions control systems occurs and that it is illegal. **Individual B** advised the landfill manager, Ryan GRILEY was aware of the deletion of emissions control systems. **Individual B** advised the vice president, Jeffrey SIZEMORE, was also aware because SIZEMORE was the individual who approves what happens at the company. According to **Individual B**, BRUNS, SIZEMORE, and GRILEY are good friends with one another.

40. On October 27, 2021, an EPA-CID Task Force Officer and I conducted an in-person interview of **Individual C. Individual C** stated he/she worked as a heavy equipment mechanic for O'Rourke Wrecking Company for approximately ten years but has not been employed with the company for three years. **Individual C** stated he/she was aware the company deleted emissions control systems on their vehicles. **Individual C** stated the emissions-related deletions were performed at the mechanic shop, which is located at the Whitewater Reclamation Company landfill, which he/she advised was owned by O'Rourke Wrecking Company.

41. **Individual C** stated he/she witnessed BRUNS perform emissions control systems deletions on heavy duty diesel dump trucks and diesel pickup trucks.

19

**Individual C** described the pickup trucks as Ford F250s to Ford F450s, and possibly one F550. **Individual C** stated the deletions included but was not limited to removing the DEF, bypassing the EGR, and tuning the ECM. **Individual C** advised he/she has witnessed BRUNS hook his laptop computer to the dump trucks so an unidentified individual can tune the ECM remotely.

42.     **Individual C** stated he/she was only aware of BRUNS conducting the emissions control systems deletions. **Individual C** advised he/she believed GRILEY was aware because on multiple occasions he witnessed GRILEY standing next to BRUNS while he was using his laptop to conduct the ECM tuning process. **Individual C** believed SIZEMORE was also aware since he was responsible for approving purchases.

43.     On November 01, 2021, an EPA-CID Task Force Officer and I conducted a virtual/remote interview of **Individual D**. **Individual D** stated he/she worked as a mechanic for O'Rourke Wrecking Company for approximately six years but has not been employed with the company for two years. **Individual D** stated he/she was aware the company performed emissions control systems deletions on their vehicles. **Individual D** stated the mechanic shop was located at a landfill owned by the company, which he/she stated was located on Hooven Road in Cleves, OH. As previously mentioned, the Whitewater Reclamation Company landfill is located at 4250 Hooven Road, Cleves, OH 45002. **Individual D** stated most of the emissions control systems deletions were completed by BRUNS.

20

44.     **Individual D** was aware of at least 3 to 4 heavy duty diesel vehicles, which he/she described as dump trucks, that had their emissions control systems deleted. **Individual D** stated the deletions included but were not limited to bypassing/removing the DPF and tuning the ECM. **Individual D** stated BRUNS would hook up his company issued laptop to the vehicle so an unknown individual could remotely complete the ECM tuning. **Individual D** admitted while employed by the company, BRUNS instructed him to drill a hole in the DPF on a Kenworth dump truck, which he did. Subsequently, **Individual D** stated BRUNS hooked his laptop up to the vehicle so the ECM tuning could be done remotely.

45.     **Individual D** was aware of at least 8 to 10 diesel pickup trucks that had their emissions control systems deleted. **Individual D** described these vehicles as Ford F250s to Ford F550s. **Individual D** stated the deletions included but were not limited to deleting the DPF and tuning the ECM. **Individual D** stated a portable tuner/programmer was used to tune the ECM's on these types of vehicles and believed they were left in the vehicles and located in either the center console or glove compartment. **Individual D** stated BRUNS completed a majority of the emissions deletions on these vehicles but admitted he/she assisted in deletions on a few of the pickup trucks. **Individual D** stated when he/she participated in the emissions control systems deletions it was because BRUNS or GRILEY had instructed him/her to do so.

46.    **Individual D** stated employees knew the deletion of emissions control systems was illegal. **Individual D** recalled BRUNS and GRILEY making statements to employees in regard to not discussing the emissions control systems deletes because they could get in trouble for it.

47.    On October 27, 2021, an EPA-CID Task Force Officer and I conducted surveillance of 4250 Hooven Road, Cleves, OH 45002. At the entrance to the facility, I observed a green sign with white lettering containing the numbers "4250." Next to the address was signage for Whitewater Reclamation Company landfill. Next to the landfill sign was separate signage which stated in part "O'Rourke Now Hiring."

48.    On November 04, 2021, I received information from an Investigator with the Ohio Bureau of Motor Vehicles. A review of this information revealed vehicles registered under the various O'Rourke companies consistent with those identified by **Individuals A, B, C, and D.**

49.    On December 17, 2021, an EPA-CID Task Force Officer performed surveillance on the O'Rourke Wrecking Company Headquarters located at 660 Lunken Park Drive, Cincinnati, OH 45226. **Individual A** had contacted EPA-CID agents and stated O'Rourke Wrecking Company would be holding an annual employee meeting on this date at the above address, wherein some of the company vehicles may be observed. While conducting surveillance, the EPA-CID Task Force Officer observed O'Rourke Vehicles and was able to identify the company vehicle numbers on the. The EPA-CID Task Force Officer observed the following vehicle

numbers; # 226 (Ford F450), # 230 (Ford F350), # 232 (Ford 350), # 234 (Ford F450), # 238 (Ford F450), and # 229 (Kenworth Dump Truck). Due to the EPA-CID Task Force Officer's vantage point, they were unable to see the license plates on the above vehicles. The vehicle numbers above are consistent with the vehicle numbers identified by **Individual A** that had the emissions deleted.

50.     On December 22, 2021, an EPA-CID Task Force Officer and I conducted a virtual/remote interview of **Individual E**. **Individual E** stated he/she currently works as a mechanic for O'Rourke Wrecking Company for the last six years but was scheduled to begin a new position with a different company the following day. **Individual E** stated he/she mainly worked on dump trucks and tractor trailers. **Individual E** stated he/she was aware the company performed emissions control systems deletions on their vehicles. **Individual E** stated the mechanic shop was located at a landfill owned by the company, which he/she stated was located on Hooven Road in Cleves, OH. As previously mentioned, the Whitewater Reclamation Company landfill is located at 4250 Hooven Road, Cleves, OH 45002.

51.     **Individual E** explained he/she was aware the company had deleted emissions systems on pickup trucks and dump trucks. **Individual E** explained it was general knowledge working at the mechanic shop that some of the pickup trucks were deleted but stated this occurred on the opposite end of the shop, so he/she never directly witnessed it.

52.     **Individual E** stated he was aware through general knowledge some of the company dump trucks had undergone emissions components systems deletions. **Individual E** did not have specific knowledge of what company vehicles but stated he believed "a couple Kenworth dump trucks" were deleted but was unsure of the reason. **Individual E** stated he is not "an emissions guy" so he never took part in this type of work. **Individual E** was not familiar with emissions systems on heavy duty equipment but again had heard of the company performing emissions system component deletes on them. **Individual E** stated the company's pickup trucks are manufactured by Ford and the larger tractor trailers/dump trucks are manufactured by Kenworth and Mack. **Individual E** stated the excavators used by the company consisted mostly of Caterpillar's and possibly a few Komatsu's. This is consistent with information gathered from other witnesses and the Ohio Bureau of Motor Vehicles.

53.     From my training, experience, and discussions with other law enforcement officers, I know that the deletion of emissions control devices can be physically detected by inspecting a diesel-fueled vehicle's engine and exhaust system. As discussed above, the physical deletion of emissions control devices establishes probable cause that one or more individuals have then tuned the ECM/OBD of that diesel-fueled vehicle to allow that vehicle to operate without the emissions control device.

54.     From my interviews with **Individuals A, B, C, D, and E**, I submit that there is probable cause that diesel-fueled motor vehicles owned by O'Rourke

24

Wrecking Company with deleted emissions control devices may be located anywhere on the SUBJECT PREMISES. Additionally, there is probable cause to believe that individuals have deleted the emissions control devices and tuned the ECM/OBD of the diesel-fueled trucks and nonroad heavy equipment specifically identified in this affidavit. Lastly, I believe that there is probable cause that O'Rourke Wrecking Company and its employees have engaged in a pattern and practice that indicates there exists other O'Rourke Wrecking Company-owned diesel-fueled trucks and nonroad heavy equipment with deleted emissions control devices and tuned ECM/OBD's and that there is probable cause that such motor vehicles are likely to be anywhere on the SUBJECT PREMISES.

55. From my training, experience, and discussions with other law enforcement officers, I know individuals routinely use cellular telephones (i.e., "smart phones") to conduct business to either email, make phone calls, send messages, and utilize other applications.

56. From my training, experience, and discussions with other law enforcement officers, I know that it is common for individuals running a business (whether a lawful business, wholly illicit business, or a lawful business which commits unlawful activities related hereto) to maintain records related to the business and their activities.

57. There are many reasons why criminal offenders maintain evidence for long periods of time. First, to the offender, the evidence may seem innocuous (i.e.,

financial, credit card, and banking documents, check books, tax returns, and other financial records). To law enforcement, however, such items may have significance and relevance when considered in light of other evidence. Second, the criminal offender may no longer realize he/she still possesses the evidence or believes law enforcement could not obtain a search warrant to seize the evidence. Third, the criminal offender may also be under the mistaken belief that he/she has deleted, hidden, or further destroyed computer related evidence, which in fact, may be retrievable by a trained forensic computer expert.

58.     Thus, because Whitewater Reclamation Company and O'Rourke Wrecking Company are located and operate at 4250 Hooven Road, Cleves, OH, 45002, because individuals involved in the alleged crime work at that location, and because of the reasons discussed above, there is probable cause to believe records and other material described in Attachment B, including trucks, will be found at the SUBJECT PREMISES.

## III.   <u>SEIZURE AND SEARCH OF COMPUTERS: TECHNICAL TERMS</u>

59.     Based on my training and experience, I use the following technical terms to convey the following meanings:

> *IP Address:* The Internet Protocol address (or simply "IP address") is a unique numeric  address used by computers on the Internet. An IP address looks like a series of four  numbers, each in the range 0-255,

separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

*Internet:* The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

*Storage medium:* A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

*Computer:* includes all types of electronic, magnetic, optical, electrochemical, or other high-speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

27

## IV.   COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

60.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the SUBJECT PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media including a cellular phone. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

61.     *Probable cause.* I submit that if a computer or storage medium, as described in Attachment B, is found on the SUBJECT PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

28

b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

62.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.

30

This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Lastly,

31

information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.     Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that

32

a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

        f.     I know that when an individual uses a computer to send emails in furtherance of the scheme or to tune the ECM of a diesel engine, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

        63.    *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often

necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.     The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to examine thoroughly storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.     Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the SUBJECT PREMISES. However, taking the storage media off-site and reviewing it in a

controlled environment will allow its examination with the proper tools and knowledge.

c.    Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

64.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant. Procedures for the review of data from computers and other electronic storage are further described in Attachment B.

## V.    ATTORNEY CLIENT PRIVILEGED INFORMATION

65.    The Government neither intends nor anticipates the seizure of materials protected by the attorney-client privilege or the attorney work product doctrine. Such materials, however, may exist within and be inadvertently collected with the body of materials seized. As is customary law enforcement practice, any materials encountered by the investigation/prosecution team members that appear to be

privileged or otherwise protected will be immediately segregated and marked as "Potentially Privileged Materials." The purpose of this segregation is to limit exposure and prevent improper disclosure of the potentially privileged information and to allow for a proper review to be conducted by a separate team of personnel not associated with the investigation/prosecution team.

66.     With respect to the seizure of electronically-stored information (ESI), computer forensic examiners will not release to the investigative team the results of their forensic analysis of the seized ESI until those results have been screened for indicia of privilege, pursuant to any attorney-client search terms provided by defense counsel or otherwise known to the Government. Potentially privileged ESI will be reviewed, if at all, only by a separate team not associated with the investigation/prosecution team.

## VI.    CONCLUSION

67.     Based on the above information, I respectfully submit that there is probable cause to believe that violations of Title 42, United States Code, Section 7413(c)(2)(C) have been committed, and that evidence and instrumentalities of this criminal conduct, as further described in Attachment B, will be found in the SUBJECT PREMISES located at 4250 Hooven Road, Cleves, OH 45002 and further described in Attachment A. I therefore respectfully request that this Court issue a warrant authorizing a search of the SUBJECT PREMISES, vehicles, and

appurtenant areas more specially described in Attachment A, by criminal investigators of EPA-CID and by technical personnel. EPA-CID will lead the execution of this search warrant. The law enforcement officers executing the search warrant are authorized to enlist the assistance of necessary computer forensic personnel and other appropriate federal, state, and local personnel in the execution of this search warrant.

FURTHER AFFIANT SAYETH NOT.

_Michael Jt Schmitt_
_____
Michael Schmitt
Special Agent
Environmental Protection Agency

Sworn to and affirmed by telephone ___16___ day of February 2022

Karen L. Litkovitz
United States Magistrate Judge

37

**ATTACHMENT A**

**LOCATION TO BE SEARCHED**

The premise to be searched is the following:

The PREMISES is located at 4250 Hooven Road, Cleves, OH 45002. There is signage near the parking lot that states "Whitewater Reclamation Company," "O'ROURKE and "4250." This facility/area consists of open area with various structures, vehicles, equipment, and trailers. The areas to be searched include all structures and vehicles/equipment owned by O'Rourke, located within the boundaries of the property lines. The maintenance garage is a large metal construction building that is white in color with red accents. To the east of the maintenance garage is the office structure, which is a metal trailer/modular building.  This also includes various trailers/containers located within that property lines, which can be used to store equipment/items.

The PREMISES consist of approximately 52.3 acres. Hamilton County records indicate the parcel ID as 630-0110-0027-00 63. The North end of the parcel is bordered by Brotherhood Avenue. The East end of the parcel is bordered by Adams Street. The south end of the parcel is bordered by Louisville Pike.

Photographs and maps of the premise is below:







**Maintenance Garage**



**Maintenance Garage**





# ATTACHMENT B
# ITEMS TO BE SEIZED AND SEARCHED

The following items, located within the location to be searched that constitute evidence or instrumentalities of potential violations of 18 U.S.C. § 371 and 42 U.S.C. § 7431(c)(2)(C), involving O'Rourke Wrecking Company (O'Rourke) and others and occurring after February 17, 2017, including the following:

**Definitions:**

a. "Document" or "record" means any written, recorded, or graphic material of any kind, whether in hard copy or electronic form.

b. "O'Rourke" or the "company" means the business organization O'Rourke Wrecking Company and/or its predecessors, successors, subsidiaries, parent companies, affiliates, franchises, divisions, branches, facilities, committees, partnerships, and joint ventures in which it has any interest; and its past or present officers, directors, trustees, employees, agents, consultants, attorneys, representatives, and any other persons acting on its behalf; and/or the facilities owned, occupied, and/or controlled by O'Rourke Wrecking Company. This includes but is not limited to M&M Services Group, O'Rourke Equipment Services Company, O'Rourke Heavy Highway, O'Rourke Wrecking Group Company, O'Rourke Wrecking Service Company, O'Rourke Wrecking Transport Company, and Whitewater Reclamation Company.

c. "Concerning," "relating to," "regarding," or "reflecting" means constituting, analyzing, describing, discussing, reporting on, commenting on, inquiring about, setting forth, explaining, considering, mentioning, regarding, or alluding to, in whole or in part, the matter requested.

**Documents**:

1. Documents relating to the purchase, design, installation, use, modification, and/or removal of any defeat device and/or tuner.

1

**Physical Items:**

2. O'Rourke diesel-fueled trucks and nonroad heavy equipment for the limited duration and purpose of inspecting those motor vehicles and engines for evidence of the deletion of emissions control devices and tampering with ECM, OBD, or other diagnostic and monitoring devices required under the CAA, including computer imaging of the vehicles' onboard computers.
3. Defeat devices, including but not limited to the emissions hardware components (DOC, DPF, SCR, DEF, or EGR) and tuners.
4. Engine diesel particulate filters or selective catalytic reductions that have been "hollowed out" or altered, and any other hardware that demonstrates physical modification of a vehicle's emission control system, including straight pipes and block plates.

**Photographs/Videos:**

5. Photographs or videos of the Premises or any O'Rourke vehicles and/or equipment.

**Electronic Devices:**

6. Computer(s), computer hardware, or cellular telephone/device in the possession or control of BRUNS, to include software, related documentation, passwords, data security devices (as described below), videotapes, and or video recording devices, and data that may constitute instrumentalities of, or contain evidence related to the specified criminal offenses.
7. Computer(s) or computer hardware kept in or stored in the office (i.e. the office trailer building located east of the maintenance garage), to include software, related documentation, passwords, data security devices (as described below), videotapes, and or video recording devices, and data that may constitute instrumentalities of, or contain evidence related to the specified criminal offenses.
8. The onboard computer on any vehicle owned, leased, or rented by O'Rourke.

For any computer, cellular device, electronic storage media or digital device whose seizure is otherwise authorized by this warrant, (hereinafter, "computer"):

1. The following definitions apply to the terms as set out in this affidavit and attachment:

   a. Computer hardware: Computer hardware consists of all equipment, which can receive, capture, collect analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Hardware includes any data-processing devices (including but not limited to cellular telephones, central processing units, laptops, internal and peripheral storage devices such as external hard drives, thumb drives, SD cards, flash drives, USB storage devices, CDs and DVDs, and other memory storage devices); peripheral input/output devices (including but not limited to keyboards, printer, video display monitors, and related communications devices such as cables and connections), as well as any devices mechanisms, or parts that can be used to restrict access to computer hardware (including but not limited to physical keys and locks).

   b. Computer software is digital information, which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

   c. Documentation: Computer-related documentation consists of written, recorded, printed, or electronically stored material, which explains or illustrates how to configure or use computer hardware, software, or other related items.

   d. Passwords and Data Security Devices: Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation or data. Data security devices may consist of hardware, software or other programming code. A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touches. Data

security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

2. For any computer, computer hard drive, or other physical object upon which computer data can be recorded that is called for by this warrant:

   a. documents, records, data, or correspondence, in any format or medium, that shows who used, owned, or controlled the computer at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b. documents, records, data, or correspondence, in any format or medium, that show the presence of software that would allow others to control the computer, such as viruses, Trojan horses, and other forms of malicious software, as well as documents, records, data, or correspondence, in any format or medium, that show of the presence or absence of security software designed to detect malicious software;

   c. documents, records, data, or correspondence, in any format or medium, that show the lack of such malicious software;

   d. documents, records, data, or correspondence, in any format or medium, that show the attachment to the computer of other storage devices or similar containers for electronic evidence;

   e. documents, records, data, or correspondence, in any format or medium, that show the presence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer;

   f. documents, records, data, or correspondence, in any format or medium, that show the times the computer was used;

   g. passwords, encryption keys, and other access devices that may be necessary to access the computer;

   h. documentation and manuals that may be necessary to access the computer or to conduct a forensic examination of the computer;

   i. documents, records, data, or correspondence, in any format or medium, that are necessary to understand the documents, records, data, or correspondence otherwise described in this attachment.

With respect to the search of any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including

4

CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

> 1. surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

> 2. "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

> 3. "scanning" storage areas to discover and possible recover recently deleted files;

> 4. "scanning" storage areas for deliberately hidden files; or

> 5. performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

> 6. If after performing these procedures, the directories, files or storage areas do not reveal evidence of the specified criminal activity, the further search of that particular directory, file or storage area, shall cease.

With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable.  If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review.  The investigative team will take no further steps regarding any review of information so segregated absent further order of the

court. The investigative team may continue to review any information not segregated as potentially privileged.

**Attachment C**
**Acronyms**

**CO**: Carbon Monoxide. A colorless, odorless gas that is a by-product of the combustion of diesel fuel.

**DEF**: Diesel Exhaust Fluid. DEF means a liquid reducing agent or reductant (other than the engine fuel) used in conjunction with SCR to reduce NOx emissions. DEF is generally understood to be an aqueous solution of urea. 40 C.F.R. §§ 86.004-2, 86.1803-01, & 1039.110.

**DOC**: Diesel Oxidation Catalyst. A DOC is an emissions control device that treat diesel exhaust. As the exhaust flows through the DOC, a catalytic reaction occurs that breaks down pollutants such as NMHCs and CO in the exhaust into less harmful components. U.S. Environmental Protection Agency Technical Bulletin: Diesel Oxidation Catalyst, EPA-420-F-10-031, May 2010.

**DPF**: Diesel-particulate filter. A DPF is an emissions control device that traps PM and removes it from a diesel engine's exhaust. U.S. Environmental Protection Agency Technical Bulletin: Diesel Particulate Filter General Information, EPA-420-F-10-029, May 2010.

**ECM**: Electronic control module. The ECM is the engine's on-board computer that receives inputs from various sensors and sends outputs through activators to engine, vehicle, or equipment functions.

**EGR**: Exhaust Gas Recirculation. An EGR is an emissions control device that recirculates an engine's exhaust back through the engine to reduce emissions. U.S. Environmental Protection Agency, Office of Enforcement and Compliance Assurance, EPA Tampering Policy, Nov. 23, 2020.

**HDDE**: Heavy-duty diesel engines. HDDE are engines that the engine's manufacturer intends to be used in heavy duty vehicles such as dump trucks. They are subject to regulation at 40 C.F.R. Part 86, Subpart A. 40 C.F.R. § 86.082-2.

**NMHC**: Non-methane hydrocarbons. NMHC are compounds consisting of hydrogen and carbon that are constituents of diesel fuel and are found in emissions from diesel-fueled vehicles.

**NOx**: Nitrogen Oxides. Common name for nitrogen oxide-based emissions from diesel-fueled vehicles such as $NO_2$ and $NO_3$.

**OBD**: On-board diagnostic. An OBD is part of an engine's ECM and is composed of software and sensors that monitor the functioning of emissions control devices and provides users with notice when such a device malfunctions.

1

**PM**: Particulate Matter. Common abbreviation for the mixture of very small liquid droplets and solid particulates found in diesel fuel emissions.

**SCR**: Selective catalytic reduction. An SCR is an emissions control device that injects a liquid-reductant agent (DEF) into the exhaust of a diesel engine to create a chemical reaction that reduces NOx emissions in the exhaust. 77 F.R. 488 (Jan. 5, 2012.)